IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**FILED IN CLERK'S OFFICE**
U.S.D.C. Atlanta

**JAN 1 4 2009**

JAMES N. HATTEN, Clerk

By: ～～ＲＡ

Deputy Clerk

ELLEN SCHAAF,

   Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION
d/b/a GLAXOSMITHKLINE;
SMITHKLINE BEECHAM
CORPORATION; and
GLAXOSMITHKLINE,

   Defendants.

CIVIL ACTION
NO. 1:04-cv-2346-GET

O R D E R

The above-styled matter is presently before the court on:

(1) Defendant's motion to seal defendant's itemization of attorney's fees [docket no. 568];

(2) defendant's motion to strike [docket no. 624];

(3) defendant's motion to seal document [docket no. 626];

(4) plaintiff's motion for judgment as a matter of law [docket no. 638];

(5) defendant's motion to seal defendant's reply in support of its itemization of attorney's fees [docket no. 641];

(6) defendant's oral motion for judgment as a matter of law on all of plaintiff's claims;

(7) defendant's motion to seal defendant's consolidated response to plaintiff's offers of proof [docket no. 647].

## Motions to seal

Having reviewed the defendant's motions to seal, the court hereby GRANTS defendant's motion to seal defendant's itemization of attorney's fees [docket no. 568], defendant's motion to seal document [docket no. 626], defendant's motion to seal defendant's reply in support of its itemization of attorney's fees [docket no. 641], and defendant's motion to seal its consolidated response to plaintiff's offers of proof [docket no. 647].

## Motion to strike

Defendant moved to strike, as a sanction, all of plaintiff's claims for monetary relief, including attorney's fees. Defendant, pursuant to a directive of the court, filed its "Notice of Examples of Plaintiff's Egregious Misconduct During Trial" on December 4, 2008. Plaintiff filed a response to the motion to strike and to defendant's notice of examples.

On December 5, 2008, the parties began presenting oral argument on defendant's motion to strike. The court suspended oral argument in open court and continued discussions with the attorneys on the motion in chambers where the attorneys were instructed to submit any additional argument, if necessary, in writing "next week." On December 9, 2008, defendant filed a reply brief in support of its motion to strike.

As discussed below, the court granted defendant's motion for judgment as a matter of law. Therefore, it would appear that

defendant's motion to strike plaintiff's claims for monetary relief is now moot.  To the extent a ruling is required, however, the court hereby DENIES defendant's motion to strike [docket no. 624].

**Motions for judgment as a matter of law**

A jury trial in the above-styled matter was held before the Honorable G. Ernest Tidwell  commencing on November 12, 2008.  Due to an unavoidable conflict in Judge Tidwell's schedule on  November 19, 2008, the Honorable Jack T. Camp presided over the proceedings in this matter on that date during which time evidence was presented to the jury through the videotaped depositions of Jose Castrillo, Barbara Poole and D.J. Mitsch.  Judge Tidwell reviewed the transcripts of the deposition designations of these witnesses in ruling on the parties' objections to the testimony.  Judge Tidwell presided over the remainder of the trial.

The defendant rested its case on December 9, 2008 and, after stipulations were read to the jury, the parties indicated that all of the evidence in the case was closed. After the close of the evidence, the jury was excused for the evening.  Thereafter, the plaintiff made a motion for judgment as a matter of law on plaintiff's FMLA interference claim and defendant's "mixed motive defense."  Defendant made a motion for judgment as a matter of law as to all of plaintiff's claims.  The court heard oral argument from the parties on their motions.  Furthermore, plaintiff filed a written motion and brief in support of her motion for judgment as

a matter of law.   After considering the parties' motions and arguments (both oral and, in the case of plaintiff, written), as well as the evidence admitted at trial, the court issued an oral ruling and minute order denying plaintiff's motion for judgment as a matter of law and granting defendant's motion for judgment as a matter of law as to all of plaintiff's claims.   The court now memorializes that ruling in writing.

## Standard

Federal Rule of Civil Procedure 50 provides that

> [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P . 50(a).   The court considers all of the evidence in the light  most favorable to the non-moving party to determine "whether the facts and inferences point so overwhelmingly in favor of the movant...that reasonable people could not arrive at a contrary verdict." Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1029 (11th Cir. 2008).

## Facts

The testimony and exhibit evidence in this case is quite extensive and the court will not attempt to recite all of the facts in this order but provides the following basic facts from the

record as context for the discussion.  The court relies, however, on all of the evidence admitted at trial in reaching its decision.

Plaintiff began her employment with defendant in 1989 as a sales representative.  Plaintiff was promoted to the position of District Sales Manager ("DSM") in September of 1993.  In September 1999, plaintiff was promoted to the position of Regional Vice President ("RVP") overseeing DSMs.  Plaintiff's territory included Florida and part of South Georgia and was responsible for selling the central nervous system product line.  Plaintiff was assigned to the regional office of defendant located in Atlanta but plaintiff had been approved to work remotely from her home in Charleston, South Carolina.  Plaintiff's position required a significant amount of work-related travel.

As RVP, plaintiff reported to Chris Singer, Sales Vice President.  At the time, Mr. Singer had between 14-18 RVPs reporting to him.  Singer told plaintiff that her new region was one of his top potential regions in the country but that it would need strong performance management to turn around the sales performance in the region.

Karen Cutler began providing plaintiff with Human Resource ("HR") support in the Spring of 1997 when plaintiff was a DSM working in South Carolina.  Cutler continued providing HR support to plaintiff when plaintiff was promoted to RVP.  Cutler testified that she never observed plaintiff dealing with employees in a way

that she regarded as an unprofessional manner.  She also observed plaintiff conduct herself appropriately on the occasions that she observed plaintiff providing performance management feedback to DSMs.

In late 2000 or possibly 2001, Jose Castrillo, one of plaintiff's DSMs, relayed some concerns about plaintiff and her management style to Karen Cutler.  Cutler was the Human Resource Manager assigned to support plaintiff's region.  Cutler did not take these concerns to be a formal complaint and no investigation occurred.

In May 2002, plaintiff received an "exceeds expectation" rating from Chris Singer on her performance review for 2001.  In June 2002, Lisa Gonzalez became plaintiff's supervisor.  Soon after, plaintiff informed Gonzalez that she was pregnant and would be taking short-term disability leave for the birth of her fourth child.  Plaintiff requested and was granted leave under defendant's short-term disability plan and under the Family Medical Leave Act ("FMLA").

In July 2002, two DSMs who worked under plaintiff's supervision, Stewart Miller, and Jose Castrillo, as well as Liz Murray, who was transitioning from a DSM position under plaintiff's supervision to a specialty sales representative position with a different supervisor, called Human Resource Director Cynthia Kelly to lodge formal complaints against plaintiff.  Kelly assigned HR

Page 6

Managers Kim Teunis and Karen Cutler to interview Murray, Miller and Castrillo.  Murray, Miller and Castrillo complained of communication and accessibility problems, a hostile and threatening management style and administrative deficiencies including the timeliness of performance reviews.

Following these interviews, Kelly determined that the information provided by the three DSMs created a need for an expanded investigation to include interviews of the other managers who reported to plaintiff.  On July 30, 2002, Kim Teunis and Karen Barnette contacted plaintiff and informed her that there was going to be an investigation into her management style.  During that telephone conversation, plaintiff informed Teunis and Barnette that she was aware that some of her managers were recruiting other managers to come forward with a complaint about her to human resources.  Plaintiff specifically identified David Clark, Tom Bryant and George Ellis.  Plaintiff also told Teunis and Barnette that Tom Bryant had told another DSM that he did not like working for a woman.

Barnette and Teunis conducted the interviews of the other employees.  Although Cutler participated in the initial interviews of the investigation, she was removed from the process  when it was determined that a more extensive investigation would be conducted.  Cutler's removal was a joint decision between Cutler and Kelly to preserve Cutler's relationship as the HR manager assigned to

support plaintiff with HR issues. Cutler provided her paper files in the investigation to Teunis and Barnette. Cutler also had a conversation with Teunis and Barnette regarding pending performance issues related to DSM David Clark (which resulted in formal discipline) and Jose Castrillo (about whom plaintiff had concerns).

Teunis and Barnette interviewed all of plaintiff's managers. Many of these managers expressed concerns similar to those expressed in the initial interviews. Also as part of the investigation, plaintiff was interviewed on August 16, 2002 at the Research Triangle Park ("RTP") office and on August 20, 2002 at the National Sales Meeting in Cincinnati by Teunis and Barnette. During plaintiff's interview, she was told that the complaints were concerns about management style, responsiveness to email and responsiveness to voicemail. Plaintiff was given an opportunity to respond to these concerns and to provide Teunis and Barnette with any information that she wanted to give regarding these concerns. Barnette and Teunis provided summaries of their interviews to Ms. Gonzalez.

Defendant has a progressive discipline policy for corrective action for performance-related issues. Generally, the policy starts with coaching and counseling. If issues continue, the next step is usually a verbal warning. If the individual is not successful in meeting the expectations of a verbal warning, the next step in the process is generally a written warning. The final

step would be separation from the company if the individual did not meet the terms of the written warning.  The company reserves the right in its sole discretion to administer the discipline it deems appropriate in any given situation.

After reviewing the information from Barnette and Teunis, Gonzalez decided to issue a Verbal Warning to plaintiff and place plaintiff on a Performance Improvement Plan (PIP).  Plaintiff's sales performance was never at issue and, in fact, plaintiff's region was the Ruby Award winner which recognizes the region that is number three in the nation based on sales performance.  On September 5, 2002, Gonzalez and Barnette met with plaintiff and informed her that she was being issued a Verbal Warning and placed on a PIP.  During this meeting, the requirements of the PIP were discussed but plaintiff was not given anything in writing.  Any deadlines and requirements that would have taken plaintiff past the time of her leave or any physician-imposed travel restrictions related to her pregnancy were adjusted.

The requirements and deadlines were put into a letter to plaintiff indicating that the PIP was to conclude on December 5, 2002.  This letter was dated September 13, 2002 but according to plaintiff it was not received by her until September 20, 2002.  Plaintiff returned a signed copy of the Verbal Warning to Cynthia Kelly on October 8, 2002.

The time period for completion of the PIP from the time plaintiff received the written copy to its expiration was approximately 10 weeks.  During that time, plaintiff already had work obligations scheduled, including a national product training meeting lasting approximately one week, an RVP planning meeting lasting three to four days, and several committee meetings in different locations.

Pursuant to the PIP, plaintiff engaged the services of the Pyramid Resource Group to conduct a team-building exercise with plaintiff and her subordinates.  The exercise was called "The Extraordinary Game."  This was a sixteen week program that began with a kickoff meeting in November followed by a schedule of weekly conference calls of approximately one hour in duration.  Because plaintiff would be on maternity leave during part of the game's duration, Jack Planchard, the individual who had been chosen to serve as interim RVP during plaintiff's leave, joined the Extraordinary Game at the beginning while plaintiff was still at work.  The team made some progress before plaintiff left on leave.

According to a November 5, 2002 letter to Planchard, he was appointed to the position of Interim RVP beginning December 1, 2002 for an anticipated four month duration.  Planchard's appointment started prior to plaintiff's leave to permit a smooth transition.

On December 11, 2002, plaintiff was informed by Kelly and Gonzalez that the Verbal Warning and PIP were being extended until

January 16, 2003.  At the time, plaintiff was attending training at the Center for Creative Leadership, which was one of the requirements of the PIP.  According to plaintiff, Kelly and Gonzalez told her that the extension was needed so they could get feedback from plaintiff's executive coach.  Defendant presented evidence that during the initial period of the Verbal Warning, Gonzalez was frustrated by plaintiff's progress on the PIP and thought plaintiff was not taking it seriously enough.

Plaintiff did not receive a written confirmation of the extension defining the reasons for the extension or any new deadlines for accomplishing tasks.  On January 16, 2003, plaintiff was informed that her Verbal Warning and PIP were being extended a second time.  Because of plaintiff's upcoming leave, plaintiff was told that she would have thirty days after her return from leave to complete the PIP.

The Commercial Practices Policy is a code of ethics adopted by most pharmaceutical companies that sets forth what the companies can and can not do in promoting their products.  Monitoring the expense reports submitted to managers is one of the responsibilities of a RVP in a pharmaceutical company to make sure that managers and sales representatives are not spending money in a way that is inconsistent with the commercial practices policy. The process for submitting expenses required DSMs to electronically submit their expense reimbursement requests to expense services.

The DSMs would then send the hard copies of the expense reports to plaintiff's administrative assistant in the Atlanta office, Ginger Malone.   Malone would make a record of the expense requests that she received.   Malone would then forward them to plaintiff. Plaintiff was then responsible for reviewing the expense requests and submitting approved reports with supporting documentation to expense services.

In December 2002, Planchard received a message from Expense Services delineating numerous outstanding sales force expense reports.   Some were dated as early as April 2002.   Because plaintiff had not yet taken leave, Planchard was not sure why he had received the message and asked plaintiff if he needed to do anything about the outstanding reports.   Planchard received a second message on January 17, 2003  with a similar lengthy list of missing expense reports.   Planchard was told that the expense reports usually roll off the list as the backlog catches up internally.   After Planchard took over the region as the interim RVP, he received messages from expense services on January 31 and February 14, 2003 still containing a lengthy list of missing expense reports from the time period plaintiff was responsible for processing the reports.   Planchard found it unusual to have so many old expense reports and undertook efforts to resolve them.   Once the old expense reports were cleared out of the system and Planchard became responsible for processing the expense reports,

there were never more than a few expense reports listed each month. Planchard used the same procedure for processing expense reports as plaintiff in that DSMs would send the hard copies of their expense reports to Malone who would then record them and forward them to Planchard for approval.

Plaintiff began her leave on January 21, 2003 - the day she delivered her baby. Although plaintiff had not been specifically prohibited from working while on leave after her three prior pregnancies, Gonzalez told plaintiff not to work during her leave. Plaintiff also was told that she could not continue participation in the Extraordinary Game during that time. Plaintiff, however, made some work-related contacts while on leave, requiring Gonzalez to remind plaintiff of her instruction about not working during leave.

In March 2003, Sandy Rice, one of plaintiff's subordinates, asked Planchard to arrange a meeting between the DSM team and Gonzalez because of the team's concerns related to Plaintiff's return to the RVP position. Gonzalez and Kelly met with plaintiff's management team on April 1, 2003 to discuss their concerns. The team talked about the improvements with the team since plaintiff left including better communications, increased morale and reduced administrative burdens.

On April 15, 2003, plaintiff's first day back from leave, plaintiff flew to RTP to meet with Gonzalez and Kelly. At this meeting, plaintiff was informed that she was being demoted to a DSM position in Charleston, South Carolina. Alternatively, she could leave the company. Plaintiff was told that there were some things that came up while she was on leave that prompted the decision.

Cynthia Kelly sent a memo dated April 18, 2003 to plaintiff stating, "As Lisa and I discussed with you on Tuesday April 15, 2003, the concerns and issues are consistent with what has been outlined for you on numerous occasions and in your verbal warning. These concerns focus on your lack of administrative skills and inappropriate management style." On April 22, 2003, Cynthia Kelly sent plaintiff a memo, with a copy to Lisa Gonzalez, in response to plaintiff's April 17, 2008 email. The memo stated, *inter alia*, "[i]ssues concerning your performance (including your verbal warning), as well as the impact of these performance deficiencies on your region have been discussed with you on a number of occasions. In addition, and more importantly, the negative impact of these issues on your region became acutely apparent over the last few months when, in your absence, your region finally began to communicate and function productively as a team. We have not been able to achieve this critical goal under your leadership. We have concluded that these improvements would be seriously jeopardized

Page 14

should you return to the RVP position, given the nature and extent of your performance problems and the lack of improvement we have seen with these issues."

Plaintiff accepted the DSM position in Charleston "under protest." Plaintiff was put on involuntary administrative leave until the transition could be made. Plaintiff continued to receive her RVP salary.

Discussion

Plaintiff pursued three claims at trial: (1) violation of the Pregnancy Discrimination Act related to her demotion from Regional Vice President to District Sales Manager; (2) Family Medical Leave Act Interference, and (3) Family Medical Leave Act Retaliation. Defendant asserts that the demotion was unrelated to plaintiff's pregnancy or the taking of family medical leave but, rather, was based on plaintiff's performance deficiencies. Specifically, defendant cited the information that Ms. Gonzalez learned while plaintiff was on leave that there were still "trust issues" in the region and that administrative problems, particularly related to missing expense reports, were much worse than previously known.

**FMLA Interference**

The FMLA affords an eligible employee twelve weeks of unpaid leave in any one-year period "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a). An employee has the right

following FMLA leave to be restored by the employer to the position of employment held by the employee when the leave commenced or to an equivalent position.   29 U.S.C. § 2614(a)(1)(A).

To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA. See 29 U.S.C. § 2615(a)(1); Strickland v. Water Works and Sewer Bd. of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001).   An employee need not allege that his employer intended to deny the right; the employer's motives are irrelevant. Strickland, 239 F.3d at 1208.

But the right to reinstatement is not absolute; an employer can deny reinstatement if it can demonstrate that it would have taken the same action against the employee had she not been on FMLA leave.   Strickland, 239 F.3d at 1208; see also 29 U.S.C. § 2614(a)(3)(qualifying right to reinstatement so that an employee returning from FMLA leave is not entitled to "any right, benefit, or position of employment other than any...to which the employee would have been entitled had the employee not taken leave."); Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 n. 1 (11th Cir. 2000) (employer that interferes with employee's right to reinstatement "bears the burden of proving that the employee would have been laid off during the FMLA period for reasons unrelated to the [FMLA leave], and therefore is not entitled to restoration").

Under FMLA implementing regulations, plaintiff has "no greater right to reinstatement or to other benefits and conditions of employment than if [she] had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). See Wu v. Southeast-Atlantic Beverage Corp., 321 F. Supp.2d 1317, 1341 (N.D. Ga. 2004). See also Kohls v. Beverly Enterprises Wisconsin, Inc., 259 F.3d 799, 802-06 (7th Cir. 2001) (finding no violation of the FMLA where employee was terminated upon return from maternity leave for poor job performance and improper handling of funds, much of which was discovered during the employee's absence; "The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee.").

The fact that plaintiff's leave was what permitted defendant to discover the extent of the administrative problems related to expense reports and the extent of the negative effect plaintiff's management style was having on her subordinates does not support a finding of FMLA interference.   Defendant presented undisputed evidence that the leave was not the cause of the demotion.   While plaintiff testified that there were often expense report issues in her region that would eventually "roll off" the report, defendant presented evidence, undisputed by plaintiff, that the number and volume of issues which regularly appeared in plaintiff's region were not typical and were cause for great concern to the defendant

due to the regulatory requirements imposed on the defendant. Therefore, the court finds that defendant has satisfied its burden of demonstrating that it would have taken the same action had plaintiff not been on leave.

## FMLA retaliation and Title VII/PDA discrimination

The Pregnancy Discrimination Act ("PDA") provides that the prohibition against sex-based employment discrimination in 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions." See 42 U.S.C. § 2000e(k). Further, the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes...and as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits. Armindo v. Padlocker, Inc. 209 F.3d 1319, 1320 (11th Cir. 2000).

To prove FMLA retaliation, an employee must show that his employer intentionally discriminated against him for exercising an FMLA right. See 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c). Unlike an interference claim, an employee bringing a retaliation claim "faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." Strickland, 239 F.3d at 1207.

In the absence of direct evidence of defendant's discriminatory or retaliatory intent, both the PDA and FMLA retaliation claims are analyzed under the burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973). For the purposes of this order, the court presumes that plaintiff established a prima facie case of pregnancy discrimination and FMLA retaliation. Because the remainder of the analysis for the FMLA retaliation and PDA claims is essentially the same, the court will address these claims together.

Once a plaintiff has established a prima facie case of discrimination or retaliation, the defendant must come forward with a non-discriminatory or non-retaliatory reason for the challenged action. <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006). If the defendant puts forth such a reason, the plaintiff must demonstrate that the defendant's stated reason for the action is pretextual. <u>See Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1287 (11th Cir. 1997).

A plaintiff can satisfy her burden of showing pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981). There must be sufficient evidence to allow

a reasonable fact-finder to conclude that the employer's articulated reasons are not believable. <u>Jackson v. State of Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005). This can be accomplished by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation such that a reasonable factfinder could find them unworthy of credence. <u>Id.</u> The plaintiff must present significant and probative evidence of pretext in order to avoid a judgment against her. <u>See</u> <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996). If the proffered reason was legitimate and nondiscriminatory, then the plaintiff must "'meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" <u>Brooks v. County Comm'n of Jefferson County, Ala.</u>, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)). "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" <u>Id.</u> (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515, 113 S. Ct. 2742 (1993).

While a short passage of time between a protected activity and the adverse action is sufficient to satisfy the causal element of a prima facie case, it is not sufficient, by itself, to establish pretext. <u>See</u> <u>Hurlbert</u>, 439 F.3d at 1298 (stating that the passage of less than two weeks between the plaintiff's request for leave

Page 20

and his termination was "probably insufficient to establish pretext by itself"). In addition, an employer may fire an employee based upon erroneous facts, as long as it is not for a discriminatory reason. See Abel v. Dubberly, 210 F.3d 1334, 1339 n. 5 (11th Cir. 2000). The factual issue to be resolved is not the wisdom or accuracy of the employer's proffered reason but whether the conclusion is an honest one. Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

Having carefully reviewed the evidence in the light most favorable to plaintiff, the court finds that there has been no evidence admitted which rebuts the legitimate, non-discriminatory, non-retaliatory reasons put forth by defendant for the demotion. Plaintiff spent a great deal of time trying to discredit the investigation by the Human Resource Department which led to plaintiff's Verbal Warning and PIP, as well as the motives of the direct reports who made the complaints which prompted the investigation. Likewise, plaintiff questioned the timing of Gonzalez's decision and the fairness of defendant's actions against plaintiff. None of the evidence, however, would support a finding

that plaintiff's pregnancy or FMLA leave was the reason for defendant's decision to demote her. As discussed in regard to the FMLA interference claim, defendant presented undisputed evidence related to the missing expense reports and the influence this information had on defendant's decision to demote plaintiff.

Accordingly, for all of the foregoing reasons, defendant's motion for judgment as a matter of law as to all claims is GRANTED. Plaintiff's motion for judgment as a matter of law as to her FMLA interference claim and defendant's mixed motive defense [docket no. 638] is DENIED.

## Summary

(1) Defendant's motion to seal defendant's itemization of attorney's fees [docket no. 568] is **GRANTED**.

(2) Defendant's motion to strike [docket no. 624] is **DENIED**.

(3) Defendant's motion to seal document [docket no. 626] is **GRANTED**.

(4) Plaintiff's motion for judgment as a matter of law [docket no. 638] is **DENIED**.

(5) Defendant's motion to seal defendant's reply in support of its itemization of attorney's fees [docket no. 641] is **GRANTED**.

(6) Defendant's oral motion for judgment as a matter of law on all of plaintiff's claims is **GRANTED**.

(7) Defendant's motion to seal defendant's consolidated response to plaintiff's offers of proof [docket no. 647] is **GRANTED**.

**SO ORDERED**, this  14th  day of January, 2009.

_____

G. ERNEST TIDWELL, JUDGE
UNITED STATES DISTRICT JUDGE

Page 23